United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued March 11, 1999 Decided April 27, 1999 

 No. 98-5320

 National Mining Association, 

 Appellant

 v.

 Bruce Babbitt, Secretary, 

 United States Department of Interior, et al., 

 Appellees

 Appeal from the United States District Court 

 for the District of Columbia 

 95cv00938

 Thomas C. Means argued the cause for appellant. With 
him on the briefs were J. Michael Klise and Harold P. 
Quinn, Jr. John A. MacLeod entered an appearance.

 Robert H. Oakley, Attorney, United States Department of 
Justice, argued the cause for the federal appellees. With him 


on the briefs were Lois J. Schiffer, Assistant Attorney Gener-
al, and Robert L. Klarquist, Attorney.

 Glenn P. Sugameli argued the cause for appellees National 
Wildlife Federation, et al. With him on the brief was Thom-
as J. FitzGerald.

 Before: Silberman, Ginsburg, and Garland, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Silberman.

 Silberman, Circuit Judge: National Mining Association 
challenges four regulations promulgated by the Secretary of 
the Interior (Office of Surface Mining Reclamation and En-
forcement) as part of a package of regulations governing 
damage to land, structures, and certain water supplies caused 
by mining subsidence. The district court rejected appellant's 
claims. We, however, agree with appellant that two of the 
agency's regulations are arbitrary and capricious.

 I.

 The Surface Mining Control and Reclamation Act, 30 
U.S.C. ss 1201 et seq. (1994), sets forth permit requirements 
and performance standards for coal mining operations. An 
important aspect of this statutory scheme is its regulation of 
subsidence caused by underground mining. Subsidence, as 
used in the Act, apparently refers to the kind of earth 
movement that occurs "when a patch of land over an under-
ground [coal] mine sinks, shifts, or otherwise changes its 
configuration." National Wildlife Fed'n v. Hodel, 839 F.2d 
694, 739 (D.C. Cir. 1988); see also Keystone Bituminous Coal 
Ass'n v. DeBenedictis, 480 U.S. 470, 474-75 (1987) (discussing 
coal mine subsidence and its effects). Although the word 
subsidence literally means lowering, tending downward, or 
"flatten[ing] out so as to form a depression," Webster's Third 
New Int'l Dictionary 2279 (1971), and there is no definition of 
the term in the statute or the regulations, the parties agree it 
is used only to describe the kind of subsidence caused by 
underground coal mining. For purposes of this case, we 
accept that definition.

 The central statutory provision governing "subsidence" 
provides that an underground mining permit issued by an 
approved State or Federal program must require the opera-
tor to "adopt measures consistent with known technology in 
order to prevent subsidence causing material damage to the 
extent technologically and economically feasible, maximize 
mine stability, and maintain the value and reasonably foresee-
able use of such surface lands...." 30 U.S.C. s 1266(b)(1) 
(1994).

 Subsidence regulation under the Mining Act has had vari-
ous incarnations and has generated a fair amount of litigation 
before us. See, e.g., National Wildlife Fed'n v. Lujan, 928 
F.2d 453, 455-60 (D.C. Cir. 1991); National Wildlife Fed'n v. 
Hodel, 839 F.2d at 739-41; In re Permanent Surface Mining 
Regulation Litig., 653 F.2d 514 (D.C. Cir. 1981) (en banc). In 
the aftermath, Congress added a new s 720 to the Mining 
Act, see Energy Policy Act of 1992, Pub. L. No. 102-486, sec. 
2504(a)(1), s 720, 106 Stat. 2776, 3104 (1992), which provides:

 (a) Requirements. Underground coal mining operations 
 conducted after October 24, 1992, shall comply with each 
 of the following requirements:

 (1) Promptly repair, or compensate for, material dam-
 age resulting from subsidence caused to any occupied 
 residential dwelling and structures related thereto, or 
 non-commercial building due to underground coal mining 
 operations. Repair of damage shall include rehabilita-
 tion, restoration, or replacement of the damaged occu-
 pied residential dwelling and structures related thereto, 
 or non-commercial building. Compensation shall be pro-
 vided to the owner of the damaged occupied residential 
 dwelling and structures related thereto or non-
 commercial building and shall be in the full amount of the 
 diminution in value resulting from the subsidence. Com-
 pensation may be accomplished by the purchase, prior to 
 mining, of a noncancellable premium-prepaid insurance 
 policy.

 (2) Promptly replace any drinking, domestic, or resi-
 dential water supply from a well or spring in existence 

 prior to the application for a surface coal mining and 
 reclamation permit, which has been affected by contami-
 nation, diminution, or interruption resulting from under-
 ground coal mining operations.

 Nothing in this section shall be construed to prohibit or 
 interrupt underground coal mining operations.

 (b) Regulations. Within one year after October 24, 1992, 
 the Secretary shall, after providing notice and opportuni-
 ty for public comment, promulgate final regulations to 
 implement subsection (a) of this section.

30 U.S.C. s 1309a (1994). In order to implement this new 
statutory provision, the Secretary in 1993 proposed subsi-
dence regulations revising the subsidence regulations previ-
ously promulgated under the Mining Act. See 58 Fed. Reg. 
50,174 (1993). After a notice and comment period, the Secre-
tary modified the proposed regulations and issued them in 
final form in 1995. See 60 Fed. Reg. 16,722 (1995).

 II.

 Appellant National Mining Association brought this action 
in the district court challenging 10 parts of the new regula-
tions as arbitrary and capricious, see 30 U.S.C. s 1276(a)(1); 
5 U.S.C. s 706(2)(A), and moved for summary judgment. 
The Secretary, along with intervenor National Wildlife Feder-
ation, filed cross-motions for summary judgment, which the 
district court granted. The Association limits its appeal to 
four of the district court's rulings. We consider them in turn.

 A.The Angle of Draw Presumption

 The Association's most vigorous challenge is to the regula-
tion establishing a rebuttable presumption of causation:

 If damage to any non-commercial building or occupied 
 residential dwelling or structure related thereto occurs 
 as a result of earth movement within an area determined 


 by projecting a specified angle of draw from the outer-
 most boundary of any underground mine workings to the 
 surface of the land, a rebuttable presumption exists that 
 the permittee caused the damage. The presumption will 
 normally apply to a 30-degree angle of draw.

30 C.F.R. s 817.121(c)(4)(i) (1998). As the agency explained, 
the angle of draw "is the angle of inclination between the 
vertical at the edge of the underground mine workings and 
the point of zero vertical displacement at the edge of a 
subsidence trough." 60 Fed. Reg. at 16,738. It "is one way 
to define the outer boundary of subsidence displacement that 
may occur at the surface." Id.

 Once the presumption is triggered, the burden shifts to the 
mining company to offer evidence that the damage is attribut-
able to another cause. The regulation suggests some exam-
ples: that the "damage predated the mining in question; the 
damage was proximately caused by some other factor or 
factors and was not proximately caused by subsidence; or the 
damage occurred outside the surface area within which subsi-
dence was actually caused by the mining in question." 30 
C.F.R. s 817.121(c)(4)(iv).

 Appellant claims that this presumption actually shifts the 
burden of proof to mining companies to show a negative--
that their operations did not cause subsidence--and that such 
a shift runs afoul of the Administrative Procedure Act given 
the agency's posture in such situations as proponents of an 
order. See 5 U.S.C. s 556(d) (1994); Director, Office of 
Workers' Compensation Programs, Dep't of Labor v. Green-
wich Collieries, 512 U.S. 267, 281 (1994). The government 
responds that the agency's regulation merely shifts the bur-
den of production not the burden of persuasion, and it is only 
the latter that the APA forbids. See id. at 279-80. Although 
we recognize that at a certain point along an evidentiary 
continuum a shift in the burden of production can become de 
facto a shift in the burden of persuasion, we do not think it is 
necessary in this case to draw the line. For a factual 
presumption that causes a shift in the burden of production 
must be reasonable (as we explain below, this means essen-


tially that the circumstances giving rise to the presumption 
must make it more likely than not that the presumed fact 
exists, see Secretary of Labor v. Keystone Coal Mining Corp., 
151 F.3d 1096, 1100-01 (D.C. Cir. 1998)). For two reasons, 
the agency's presumption fails that test. The first is that the 
nature of subsidence evidence that triggers the presumption 
has become hopelessly confused in this litigation, and the 
second is that the geographical boundary in which the pre-
sumption obtains--the angle of the draw--is irrationally 
broad.

 The regulation states that the presumption is employed 
wherever damage to a structure covered by the Energy 
Policy Act "occurs as a result of earth movement" within the 
angle of the draw, 30 C.F.R. s 817.121(c)(4), which gives rise 
to the question: What is the conceptual relationship between 
"subsidence" (which, it will be recalled, the parties agree 
refers to mining subsidence) and "earth movement"? On 
appeal, contrary to its position in the district court, the 
government explains that "earth movement" does not mean 
any earth movement but only "earth movement consistent 
with subsidence" and that any resulting damage to covered 
structures (also necessary to trigger the presumption) is alas 
consistent with the kind of damage caused by subsidence.

 Appellant cries foul. It claims the government cannot shift 
the meaning of the regulation during litigation. Before the 
district court the government appeared to argue that proof of 
subsidence in fact (that is, coal mining subsidence) was neces-
sary to trigger the presumption. It is not uncommon, howev-
er, when an agency regulation is challenged in a facial attack, 
as Congress permits parties to do, that the meaning of 
disputed provisions does not appear clearly until the case is 
before the courts of appeals. We typically accept the agen-
cy's construction--which often eliminates or narrows the dis-
pute--because we recognize the agency is entitled to defer-
ence as to the meaning of its own regulation. Auer v. 
Robbins, 519 U.S. 452, 462-63 (1997); Serono Lab. v. Shalala, 
158 F.3d 1313, 1325 (D.C. Cir. 1998); Association of Bitumi-
nous Contractors, Inc. v. Apfel, 156 F.3d 1246, 1251-52 (D.C. 

Cir. 1998); Paralyzed Veterans of Am. v. D.C. Arena L.P., 
117 F.3d 579, 584 (D.C. Cir. 1997), cert. denied sub nom. 
Pollin v. Paralyzed Veterans of Am., 118 S. Ct. 1184 (1998). 
Yet, we are entitled to expect that at least by the time of oral 
argument the agency will have settled on an interpretation 
that reflects its "fair and considered judgment," Auer, 519 
U.S. at 462--and that such an interpretation is understanda-
ble.

 The government assures us that, despite some vacillation, it 
has come to rest, but, unfortunately, if it has, we do not 
understand its conceptual resting point. Pressed at oral 
argument to define just what "earth movement consistent 
with subsidence" means, the government, with manifest circu-
larity, explained that the term refers to earth movement not 
caused by non-subsidence (i.e., earth movement not caused by 
earthquakes, floods, etc.). Establishing the cause of the 
damage, however--whether subsidence or something else--is 
the whole purpose of the evidentiary presumption. Indeed, 
as appellant correctly observes, one of the ways in which a 
mining company rebuts the presumption is to produce evi-
dence that the damage was proximately caused by some 
factor other than mining. See 30 C.F.R. s 817.121(c)(4)(iv). 
It thus does not help to define the trigger for the presump-
tion in terms of the presumption's intended result. In short, 
we have no clue what "earth movement consistent with subsi-
dence" means and the government's efforts to enlighten us 
created instead hopeless confusion.

 We, of course, cannot approve a regulatory presumption 
that the agency's lawyers cannot interpret in an intelligible 
fashion. But even if we did understand the relationship 
between subsidence and earth movement, as those terms are 
used in the regulation, it could not stand because the geo-
graphical boundary of the area in which the presumption 
operates--the angle of the draw--is both arbitrary and capri-
cious. That is to say, the presumption simply does not serve 
as a reasonable proxy to explain subsidence damage to struc-
tures.

 Appellant contends that the record reveals that the kind of 
subsidence that occurs within the angle of draw (pure vertical 


subsidence) is not the kind of subsidence (differential vertical 
and horizontal displacement) that ordinarily results in dam-
age to surface structures. The very authors of the scientific 
studies on which the agency relied in its proposed rulemak-
ing, the Association points out, have specifically rejected the 
predictive value of the angle of draw. And, even this evi-
dence does not support the agency's decision to base a 
nationwide presumption of causation on the angle of draw. 
The nationwide presumption is further deficient, it is argued, 
because it overlooks the key distinction between high extrac-
tion and partial extraction mining (damage to structures from 
the latter method is said to be unlikely); it ignores the critical 
variable of mining depth (the deeper the mine, the greater 
surface area is covered by the 30-degree angle of draw, yet 
the less likely is actual structural damage at the surface); and 
it ignores other non-subsidence causes of earth movement 
that are just as likely to cause damage to structures within 
the angle of draw.1

 The government's response is anemic. It emphasizes that 
the regulation permits a state regulatory authority to petition 
the Department for a different angle if it can demonstrate 
that its proposed angle is more reasonable, see 30 C.F.R. 
s 817.121(c)(4)(i), and also permits a mining company to 
request a different site-specific angle if it too could demon-
strate a more reasonable calculation, see id. 
s 817.121(c)(4)(ii). But the government does not claim--nor 
could it--that these safety valve provisions could save the 
regulatory presumption if we thought it unreasonable. As we 
have said repeatedly, an evidentiary presumption is "only 
permissible if there is a sound and rational connection be-
tween the proved and inferred facts, and when proof of one 

__________
 1 Appellant also claimed that the Department unlawfully relied 
on studies not mentioned in the proposed rule. But informal 
rulemaking does not contemplate a closed record; the government 
is entitled to rely on information not exposed to comment so long as 
it is supplementary. See generally Air Transport Ass'n of America 
v. FAA, 1999 WL 110689, at *5-6 (D.C. Cir. Mar. 5, 1999). The real 
problem with the studies is that they are inadequate support for the 
presumption.

fact renders the existence of another fact so probable that it is 
sensible and timesaving to assume the truth of [the inferred] 
fact ... until the adversary disproves it." Keystone Coal 
Mining, 151 F.3d at 1100-01 (quoting Chemical Mfrs. Ass'n 
v. Department of Transp., 105 F.3d 702, 705 (D.C. Cir. 1997) 
(quoting NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 
775, 788-89 (1990))) (emphasis added) (internal citation and 
internal quotation marks omitted) (alterations in original). 
"If there is an alternate explanation for the evidence that is 
also reasonably likely, then the presumption is irrational." 
Id.

 We think the government has failed to justify its presump-
tion. It has not offered any support, scientific or otherwise, 
that even begins to establish that the angle of draw delimits 
the surface area within which it is logical or reasonable to 
employ an evidentiary presumption of causation. Indeed, the 
government apparently concedes that it is not supported by 
available science. This is not surprising since, as appellant 
argues, science seems more supportive of the view that the 
angle of draw has nothing whatever to do with identifying 
subsidence-caused damage to structures. A leading textbook 
in the field, which the government paradoxically listed as 
support for the presumption, see 60 Fed. Reg. at 16,738, 
defines the angle of draw in such a way as to seriously 
undermine (pun intended) the government's position. See 
Syd S. Peng, Coal Mine Ground Control 422-23 (2d ed. 1986) 
(defining angle of draw, noting that it varies from 15 to 45 
degrees, and then stating: "The angle of draw is more or less 
of academic interest. Because the subsidence profile levels 
off and subsidence becomes very small far before it reaches 
the edges of the subsidence basin[,] from [a] structural dam-
ages point of view, it is practically meaningless.") (emphasis 
added).

 Nonetheless, the government thinks it sufficient to explain 
that the angle of draw is used merely "to define the bound-
aries of the area within which earth movement resulting from 
subsidence, if any, will most probably occur." But the real 
question in using the angle of draw to set the applicable 


boundaries is whether subsidence-caused damage to struc-
tures within the angle is more likely than not to occur. After 
all, the mining company's potential liability is for causing 
damage to protected structures, not for causing "earth move-
ment resulting from subsidence." Unless the government 
can establish a likely connection between the former and the 
angle of draw, the presumption cannot stand.

 The agency rejected the suggestion that the presumption 
be limited to the so-called "angle of critical deformation"--a 
smaller angle, within the angle of draw, that measures the 
inclination from the edge of the underground mining area to 
the surface point exhibiting the "maximum tensile strain" or 
stretching. See 60 Fed. Reg. at 16,738. (Dr. Peng, a leading 
expert in the field, estimates that the angle of critical defor-
mation is on average 10 degrees smaller than the angle of 
draw. See Peng at 423.) Although the government concedes 
that subsidence-caused damage to structures within the angle 
of critical deformation portion of the angle of draw is more 
likely to occur than in the portion of the angle of draw beyond 
the angle of critical deformation, it contends that its decision 
to use the entire angle of draw is justified on "possibility" 
grounds--the larger angle defines the "outer boundary of 
subsidence displacement that may occur at the surface." 
(Neither in its brief nor in the preamble to the final rule, see 
60 Fed. Reg. at 16,738-39, we should note, has the govern-
ment offered any scientific support for even the possibility of 
subsidence-caused damage within the angle of draw.)

 To impose a presumption of causation of damage on a party 
based merely on the possibility that the party caused the 
damage is to convert a factual presumption into a counterfac-
tual presumption. Although the government has never wa-
vered from its insistence that the presumption is a factual 
one, we do not see how a counterfactual procedural device 
could be justified even as a matter of policy, see Allentown 


Mack Sales & Serv., Inc. v. NLRB, 118 S. Ct. 818, 828 (1998), 
since the statute imposes liability only for causation. More-
over, the government simply has no response at all to the 
devastating objection that the angle of draw is an inherently 
illogical measure since, as a matter of geometry, the deeper 
the mine the wider the angle. Yet, it seems undisputed that 
the likelihood of any structural damage on the surface de-
creases with the depth of the mine. Since the agency recog-
nized, in its preamble to the final rule, see 60 Fed. Reg. at 
16,740, that the depth and location of the mine (and the 
amount of coal extracted) are all factors that bear on the 
likelihood of subsidence-caused damage, the Department nev-
er even adequately explains why it wishes to employ any sort 
of nationwide presumption.

 Essentially the government argues that its presumption is 
justified by efficiency; it is easier to establish a mine's 
liability. There are limits to that justification, otherwise the 
government could dispense with enforcement proceedings 
altogether. To be sure, we would be obliged to defer to a 
reasonable agency determination of probabilities--including 
predictions based on its own expertise and policies. But we 
see nothing of the sort here. We have no difficulty conclud-
ing that this regulation is both arbitrary and capricious 
because it is irrationally overbroad, and we therefore vacate 
it.

 B.Pre-Subsidence Survey

 Appellant challenges the regulation requiring all applicants 
for a mining permit to conduct, inter alia, a pre-subsidence 
"survey of the condition of all non-commercial buildings or 
occupied residential dwellings and structures related thereto, 
that may be materially damaged or for which the reasonably 
foreseeable use may be diminished by subsidence, within the 
area encompassed by the applicable angle of draw." 30 
C.F.R. s 784.20(a)(3) (1998). Appellant's principal objection 
is that, when promulgating this regulation in 1995, the agency 
failed adequately to explain its deviation from its prior policy 
not to require pre-subsidence surveys. The government re-
sponds with two internally inconsistent arguments: that the 
change in policy was justified (if not mandated) by the 

Energy Policy Act of 1992, and that the requirement of a pre-
subsidence survey of the condition of structures is not a 
change of position at all because the regulation has always 
implicitly required such a survey. We take this latter argu-
ment as an alternative one (though it would have been helpful 
if counsel had designated it as such). Even so, it is plainly 
wrong, and we are surprised that the government would 
choose to advance it. It cannot seriously be maintained that 
prior to 1995 the regulation required a pre-subsidence survey. 
The government admits as much in describing the pre-
Energy Policy Act regulatory regime: beginning in 1983, 
"[i]nstead of conducting a pre-subsidence survey, the appli-
cant was now only required to identify any lands or struc-
tures that could be materially damaged by subsidence." And 
in the preamble to the proposed version of the current 
regulation, the Secretary explained that "the survey itself 
[required by the prior regulation] is proposed to be changed 
from a mere inventory of structures, and renewable resource 
lands, to a survey of the condition of structures, facilities, and 
surface features." 58 Fed. Reg. at 50,179 (emphasis added). 
The government's argument that a pre-subsidence survey of 
the condition of structures has always been implicitly re-
quired is palpably in conflict with its own account of the 
regulatory history.

 Much the better argument is that the change in policy was 
justified by Congress' explicit instruction to the Secretary in 
the Energy Policy Act to promulgate regulations to imple-
ment the new Act, which conferred greater protection to 
structures and land from subsidence-caused damage. Once 
again, however, the government overplays its hand and sug-
gests that Congress' instruction to promulgate new regula-
tions completely absolves the agency of the requirement to 
supply a reasoned explanation for its change in policy. The 
government relies for this proposition on our decision in City 
of Las Vegas v. Lujan, 891 F.2d 927 (D.C. Cir. 1989), in which 
we stated that "[a] change in congressional instructions, of 
course, absolves the Secretary from explaining why his policy 
has changed, if indeed it has," id. at 934. But Lujan involved 
a specific congressional instruction to take a precise agency 


action--issuing emergency regulations--more readily than 
the Secretary previously had seen fit to take. See id. The 
Energy Policy Act does not refer to pre-subsidence surveys 
at all, and so we do not see how Congress' general instruction 
to implement statutory protection of structures through a 
repair or compensate obligation absolves the government of 
explaining its decision to require a pre-subsidence survey that 
it previously had opted against.

 Be that as it may, the agency did actually say in the 
preamble to the final rule that the new policy was necessary 
"to effectively implement the requirements of the Energy 
Policy Act," 60 Fed. Reg. at 16,730, and more specifically that 
the information gathered was "essential to establish a base-
line against which the effects of subsidence may be measured 
and to ensure full implementation [of the Energy Policy 
Act]," id. at 16,729. Consistent with the notion that the 
Energy Policy Act's mandate justified the Secretary's deci-
sion to increase mining companies' information-gathering re-
sponsibilities, the agency limited the survey requirement to 
structures and water supplies protected by the Energy Policy 
Act. See id. at 16,730. Greater protection for structures 
(albeit only through a repair or compensate obligation) was 
the main impetus of the Energy Policy Act, and we think the 
agency's reliance on that impetus is a satisfactory explanation 
for its change of policy.

 Appellant also contends that the agency failed to respond 
adequately to comments that the regulation is overly burden-
some, and that it irrationally requires information about the 
condition of structures at the time of the permit application, 
rather than at the time (often years later) when mining 
operations actually commence. In our view, the agency has 
said enough and its regulations are not unreasonable. The 
Secretary specifically responded to the comments complain-
ing about the cost of the survey by limiting the structures to 
which the requirement applied, and by modifying some of the 
mapping requirements of the survey. See id. We do not 
agree with appellant, moreover, that the timing of the survey 
(pre-application as opposed to pre-mining) is without purpose. 


As the government points out, the results of the pre-
subsidence survey are used to determine whether the appli-
cant is also required to submit a subsidence control plan with 
the application. See 30 C.F.R. s 784.20(b). The agency 
concluded that, based on its experience in this area, "the 
proposed format for the survey information is the minimum 
needed to adequately assess the need for a subsidence control 
plan." 60 Fed. Reg. at 16,730. The government also explains 
that the possible effects of subsidence is a relevant factor in 
its determination of whether to grant a permit in the first 
place. We see no reason why the agency should be precluded 
from requiring all of this information at the time of the 
application just because conditions might change before min-
ing begins. As the Secretary explained, the mining company 
can always supplement outdated information later in the 
process. See 60 Fed. Reg. at 16,730.

 Nevertheless, the regulation as currently written must be 
vacated along with the first one discussed because it defines 
the area within which the pre-subsidence survey is required 
by reference to the angle of draw. The government did not 
argue that the survey requirement could be sustained inde-
pendent of the angle of draw--and we do not see how it could.

 C.Planned Subsidence Minimization

 The Association next challenges two provisions of the new 
regulations that impose an obligation on mining permittees 
who use a "planned subsidence" mining technique to minimize 
subsidence damage.

 If a permittee employs mining technology that provides 
 for planned subsidence in a predictable and controlled 
 manner, the permittee must take necessary and prudent 
 measures, consistent with the mining method employed, 
 to minimize material damage to the extent technological-
 ly and economically feasible to non-commercial buildings 
 and occupied residential dwellings and structures related 
 thereto.... 

30 C.F.R. s 817.121(a)(2); see also 30 C.F.R. s 784.20(b)(7) 
(providing that mining companies required to submit a subsi-

dence control plan and projecting to use planned subsidence 
must, with certain exceptions, include "a description of meth-
ods to be employed to minimize damage from planned subsi-
dence to non-commercial buildings and occupied residential 
dwellings and structures related thereto"). Planned subsi-
dence refers to mining methods that make it possible to 
predict the time and manner of the resulting subsidence (one 
such method is "longwall mining").

 Appellant disputes the regulation's damage minimization 
requirement for planned subsidence on the ground that such 
a requirement is contrary to s 516(b)(1) of the Mining Act, 
which provides that any permit issued must

 require the operator to adopt measures consistent with 
 known technology in order to prevent subsidence causing 
 material damage to the extent technologically and eco-
 nomically feasible, maximize mine stability, and maintain 
 the value and reasonably foreseeable use of such surface 
 lands, except in those instances where the mining tech-
 nology used requires planned subsidence in a predicta-
 ble and controlled manner....

30 U.S.C. s 1266(b)(1) (1994) (emphasis added).

 Since Congress explicitly approved longwall mining, not-
withstanding that, by definition, it causes subsidence, appel-
lant argues that the regulation would frustrate Congress' 
intent. The government's minimization of damage require-
ment, we are told, is merely a paraphrase of the prevention of 
damage requirement from which longwall mining is exempt-
ed. The government argues that it is entitled to Chevron 
deference in interpreting the statutory language for the 
phrase "predictable and controlled manner" can be interpret-
ed as a manner that restricts collateral damage. Appellant, 
by contrast, would read predictable and controlled manner as 
not imposing any separate obligation but as words that simply 
describe longwall mining. If we were interpreting the statute 
de novo, we might well agree that appellant has the better 
argument. But we are not. And although the government's 
reading is a bit of a stretch, we think it passes the Chevron 
test. See Chevron U.S.A. Inc. v. Natural Resources Defense 
Council, Inc., 467 U.S. 837, 842-43 (1984).

 D.Waivers

 The Association's last challenge is to the regulation that 
implements the Energy Policy Act's "repair or compensate" 
obligation. See 30 C.F.R. s 817.121(c)(2) ("The permittee 
must promptly repair, or compensate the owner for, material 
damage resulting from subsidence caused to any non-
commercial building or occupied residential dwelling or struc-
ture related thereto that existed at the time of mining."). 
The Association asserts that the regulation is unreasonable 
"to the extent it purports to nullify prior agreements between 
owners of eligible structures and underground mine opera-
tors." In appellant's view, nothing in the Energy Policy Act 
suggests an intent to override such waiver agreements that 
would otherwise be binding under state common law. More-
over, it is urged, if the statute were read to authorize 
abrogation of waiver agreements, it would confer a windfall to 
the landowner, and consequently might constitute an uncon-
stitutional taking of the mining company's contract rights.

 The thrust of appellant's argument focuses on the unfair-
ness (and asserted conflict with the statutory language) 
caused by a "double recovery" regulatory regime, under 
which a landowner is compensated pre-subsidence damage 
(and possibly pre-Energy Policy Act) by selling a waiver of 
rights to the mining company, and then post-subsidence, post-
damage through an enforcement action under the Energy 
Policy Act. The Association contends that Congress could 
not possibly have intended such a result. At oral argument, 
however, the government stated unequivocally (which it did 
not do in its brief or in the preamble to the regulation) that 
any compensation owed to a landowner under the Act will 
always be reduced by at least the amount previously paid in a 
contractual waiver of subsidence rights--both pre-damage, 
pre-Act waivers, and pre-damage, post-Act waivers.2 In oth-

__________
 2 In the preamble, to be sure, the Secretary stated that "[t]he 
use of pre- and post-subsidence agreements would be an acceptable 
means of fulfilling the requirement so long as the terms meet the 
requirement under paragraph 817.121(c)(2) that the permittee re-
pair or compensate any subsidence-related material damage to any 


er words, the value of the landowner's rights under the 
federal regime may well exceed (indeed typically would) the 
present value of whatever compensation the landowner re-
ceived under the previous legal climate. But the landowner 
would not be entitled to a double recovery. The govern-
ment's oral clarification seems to strip appellant's challenge of 
its force and appellant waived rebuttal. Nonetheless, the 
Association's brief appeared to argue that such waivers must 
be honored fully, and that the set-off approach also is incon-
sistent with the Act.

 If appellant means to deny any obligation to compensate 
beyond the amount a mining company originally paid the 
landowner for the waiver, no matter how it would compare to 
the landowner's legal rights post passage of the federal 
statute, we reject its position. We previously upheld the 
government's limitation of the obligation to repair or compen-
sate for damage to structures only to the extent required by 
state law, see National Wildlife Fed'n v. Lujan, 928 F.2d at 
457-59, in part because the Mining Act at the time did not 
explicitly impose an obligation to compensate for such dam-
age, see id. at 458 n.3. The Energy Policy Act imposes just 
such an obligation on its face. See 30 U.S.C. s 1309a(a)(1) 
("Compensation shall be provided to the owner of the dam-
aged occupied residential dwelling and structures related 
thereto or non-commercial building and shall be in the full 
amount of the diminution in value resulting from the subsi-
dence.") (emphasis added). It is therefore wholly consistent 
with the statute--indeed it might even be mandated--for the 
Secretary to require the mining companies further to com-
pensate landowners for damages to which the new federal law 
entitled them. That is not to say, of course, that a landowner 
and mining company would be barred from entering into a 
post-Act fair contract based on anticipated damages that 

__________
non-commercial building or occupied residential dwelling or related 
structure." 60 Fed. Reg. at 16,735 (emphasis added). Although the 
Secretary did not make clear that this policy applies to both pre-Act 
and post-Act waivers, the government's position at oral argument 
was that it does. We accept the agency's interpretation of its own 
regulation.

would extinguish the landowner's claim if the damages turned 
out to be more than anticipated. But we do not understand 
the agency to deny that.

 As for appellant's takings challenge, the argument is insuf-
ficiently developed to warrant much attention. Appellant 
seems to assume that interference with contract rights is a 
per se taking, despite the well-settled rule that "legislation 
[that] disregards or destroys existing contractual rights does 
not always transform the regulation into an illegal taking." 
Connally v. Pension Benefit Guar. Corp., 475 U.S. 211, 224 
(1986). To develop a real takings argument, appellant would 
be compelled to demonstrate why "(1) the economic impact of 
the regulation on the claimant; (2) the extent to which the 
regulation has interfered with investment-backed expecta-
tions; and (3) the character of the governmental action," id. 
at 225 (quoting Penn Cent. Transp. Co. v. City of New York, 
438 U.S. 104, 124 (1978)) (internal quotation marks omitted), 
warrant the conclusion that an unconstitutional taking neces-
sarily would result. See also Eastern Enters. v. Apfel, 118 
S. Ct. 2131, 2146-49 (1998) (reviewing takings precedents and 
concluding that "Congress has considerable leeway to fashion 
economic legislation, including the power to affect contractual 
commitments between private parties"). As we understand 
appellant's argument, based solely on the possibility that the 
government's alteration of a mining company's previously 
settled contract rights "could expose" the government to 
liability for an unlawful taking, we should construe the Ener-
gy Policy Act to mandate an exemption in the Secretary's 
regulations for private waiver agreements. But the avoid-
ance canon is not applicable when the statute or regulation 
would effect a taking, if at all, only in certain situations. See 
United States v. Riverside Bayview Homes, Inc., 474 U.S. 
121, 127-28 (1985); Bell Atlantic Tel. Cos. v. FCC, 24 F.3d 
1441, 1445 (D.C. Cir. 1994); Railway Labor Executives' Ass'n 
v. United States, 987 F.2d 806, 816 (D.C. Cir. 1993). We will 
not "frustrate[ ] permissible applications of a statute or regu-
lation," Riverside Bayview Homes, 474 U.S. at 128, based on 
the specter--rather implausible from what we can tell now--
of a future unconstitutional taking.


 * * * *

 For the foregoing reasons, we reverse the district court in 
part and affirm in part.