The FUND FOR ANIMALS,
et al., Plaintiffs,

v.

Steven WILLIAMS, et al., Defendants.

Civil Action No. 01–2078(RMU).

United States District Court,
District of Columbia.

Feb. 25, 2003.

Jonathan Russell Lovvorn, Meyer & Glitzenstein, Washington, DC, for plaintiffs.

Mauricia M.M. Baca, U.S. Dept. of Justice, Environment & Natural Resources

Div., Washington, DC, Lori Caramanian, U.S. Dept. of Justice, Environment & Natural Resources Div., General Litigation Section, Washington, DC, for defendants.

## *MEMORANDUM OPINION*

### Granting in Part and Denying in Part The Plaintiffs' Motion for Summary Judgment; Granting in Part and Denying in Part The Defendants' Motion for Summary Judgment

URBINA, District Judge.

## I. INTRODUCTION

This matter comes before the court on the parties' thoroughly and cogently argued cross-motions for summary judgment. The plaintiffs are the Fund for Animals, the Biodiversity Legal Foundation, the Utah Environmental Congress, the Humane Society of the United States, and two wildlife enthusiasts (collectively, "the plaintiffs"). They bring suit against the Fish and Wildlife Service ("the Service") and the Department of the Interior (collectively, "the defendants") for allegedly violating several environmental statutes by failing to act on the plaintiffs' petition to list the Trumpeter swan as an endangered or threatened species and by authorizing a Trumpeter swan quota during Tundra swan hunting season. For the following reasons, the court grants in part and denies in part the plaintiffs' motion for summary judgment, and grants in part and denies in part the defendants' motion for summary judgment.

## II. BACKGROUND

### A. Factual Background

With a wingspan of more than seven feet, the Trumpeter swan (*Cygnus bucci-*

*nator*) is the largest native waterfowl in North America, and one of the rarest North American waterfowl species. Administrative R. ("A.R.") at 3863, 5044. At one time the Trumpeter swan inhabited almost every region of the country. *Id.* at 3695. By the end of the 19th century, however, overhunting [1]—driven by demand for hats, powder puffs, feather boas, and quills—had reduced their number to the point of near extinction. *Id.* at 3695, 4076, 5056. In addition, colonial expansion led to the destruction of the Trumpeter swan's breeding habitat. *Id.* at 4001, 4076. Other major threats to the species include lead poisoning, disease, and starvation during severe winter conditions. *Id.* at 3621, 5057, 5874–5939.

Eliminated from 99 percent of its historic range by mid-century, the only remaining indigenous wild breeding Trumpeter swan population in the contiguous United States today consists of a mostly non-migratory population in the Greater Yellowstone area of Idaho, Montana, and Wyoming (the "Tri–State" area). *Id.* at 5415, 5872, 5876. As of 2000, the Tri–State population consisted of an estimated 426–481 individual birds. *Id.* at 5607, 5701.

In part to protect Trumpeter swans from extinction, the Service began a winter feeding program for the Tri–State Trumpeter swan flock in the 1930s. *Id.* at 682, 810. Because the population does not migrate, and therefore is vulnerable to mass starvation during the severe Tri–State winters, concerns grew about the population's future existence. *Id.* at 4483, 5282, 5532. In 1992, after the severe winter of 1988–89 resulted in the starvation of more than 100 Trumpeter swans, the Service discontinued the feeding program. *Id.* at

---

**1.** The fact that Trumpeter swans fly low along the water course within the hunter's reach, and have a "suicidal habit" of circling over-

head when flushed, contributed to overhunting. A.R. 3624, 5056.

810, 968, 5316–17. To promote migration of the Tri–State flock to more suitable winter habitats, the Service began to disperse the swans through hazing and translocation programs. *Id.* at 5316–17.

As the displaced Trumpeter swans migrated, however, they began moving into traditional Tundra swan hunting areas in Utah and other states, with sometimes fatal results. *Id.* at 801, 5596, 5897. Tundra swans (*Cygnus columbianus* ) are a migratory swan species that is smaller than but closely resembles the Trumpeter swan. *Id.* at 377, 2649, 5258, 5596. The contrast between the status of the two species is marked. Tundra swans, divided for management purposes into western and eastern populations, enjoy a stable, increasing, and well-distributed population numbering in the tens of thousands. *Id.* at 811–12, 823. Trumpeter swans, grouped into the Rocky Mountain (RMP), Pacific, and Interior populations, have a less abundant and more variable status. *Id.* at 809. Of the three RMP flocks (Tri–State, Canada, and restoration), the Tri–State flock causes the greatest concern given its persistent disinclination to migrate from its overcrowded, depleted wintering areas. *Id.* at 809–11. Reflecting the difference in status between the Tundra and Trumpeter swans, the Service adopted management strategies tailored to each species, with the Tundra swan plan directed toward maintenance and the RMP Trumpeter swan plan focused on Tri–State redistribution and restoration. *Id.* at 810–11. In keeping with these objectives, the Service authorized frameworks for annual hunting of Tundra

swans but barred the hunting of Trumpeter swans.[2]

Because the western Tundra and the Tri–State Trumpeter flocks share the same flyway, however, the two management strategies came into conflict. As the Service tried to disperse the Tri–State Trumpeter swans through hazing and translocation, some of the displaced Trumpeter swans were brought into contact with Tundra swan hunting areas, where they were mistaken for Tundra swans and killed. *Id.* at 802, 5897. In 1995, to reconcile Tundra swan hunting interests with Trumpeter swan restoration efforts, the Service issued an environmental assessment ("1995 EA") authorizing a five-year experimental program that significantly restructured the annual swan hunting season in the key flyway states of Montana, Utah, and Nevada. *Id.* at 799. Specifically, the 1995 EA expanded the swan hunting season to include both Tundra and Trumpeter swans. *Id.* at 803–04. At the same time, it narrowed the swan hunting season in two respects. First, it curtailed the areas open to hunting in Montana and Utah. *Id.* at 805. Second, it shortened the season by advancing the closing date to either a date in early winter or the date that a "limited, but biologically acceptable" quota of 20 Trumpeter swans (15 for Utah, 5 for Nevada) was harvested—whichever came first.[3] *Id.* at 801, 804–05. To monitor the number and species of swans harvested, the 1995 EA required hunters to submit harvested swans to measurement or examination within 72 hours. *Id.* at

---

**2.** Tundra swan hunting has been legal since 1962, while Trumpeter swan hunting has been prohibited since 1918. A.R. 810 11, 2632.

**3.** As noted, the Service divided the Trumpeter swan quota between Utah and Nevada, with Utah subject to a quota of 15 swans and Nevada subject to a quota of 5 swans. A.R.

805. Because the Montana hunting area is north of the Tri–State area and few Trumpeters migrate northward, the Service believes that most Trumpeters taken in Montana are from non-Tri–State flocks. *Id.* 407–08. Therefore, Montana was not subject to the quota. *Id.* at 805.

808. Finally, the 1995 EA committed the Service to participate actively in cooperative efforts to improve Trumpeter distribution. *Id.* at 816.

In 2000, despite some criticism, the Service published a final EA ("2000 EA") that proposed continuing the 1995 restructuring on an operational basis in Montana and Nevada and on a three-year experimental basis in Utah. *Id.* at 2622–83; *e.g., id.* at 1043–44, 1064–65, 1108, 1169, 1185–1203. Based on the experience with the five-year program, however, the 2000 EA imposed additional restrictions on Utah, reducing the number of hunting permits from 2,750 to 2,000, lowering its Trumpeter swan quota from 15 to 10, and placing additional areas off-limits to hunting. *Id.* at 2639. In addition, because of questions about the effectiveness of translocation, the 2000 EA stated that the Service would translocate swans only on a limited, case-by-case basis. *Id.* at 2625, 2639. Accompanying the 2000 EA was a Finding of No Significant Impact ("2000 FONSI") concluding that the restructuring of the hunting season was not a major federal action that would significantly affect the quality of the human environment within the meaning of the National Environmental Policy Act ("NEPA"), and therefore did not require the preparation of an environmental impact statement ("EIS"). *Id.* at 2619.

As a result of these events, the plaintiffs took two separate but related actions. First, in October 2000, several of the plaintiffs filed suit challenging the Service's authorization of a Trumpeter swan quota. Pls.' Mot. for Summ. J. at 26; Defs.' Mot. for Summ. J. at 11. After negotiations, the plaintiffs agreed to dismiss their lawsuit and the Service agreed to prepare a new EA (accompanied by either a FONSI or EIS) to address unresolved biological and legal issues. Pls.' Mot. for Summ. J. at 26; Defs.' Mot. for Summ. J. at 11. Accordingly, in 2001, after a period for public comment, the Service issued a revised EA ("2001 EA"). *Id.* at 364–419; *e.g., id.* at 116–357, 550–61, 3513–16. As set forth in the 2001 EA, the restructured hunting season was identical to that proposed by the 2000 EA, but included yet another caveat directing Utah to enter into a five-part memorandum of understanding with the Service on swan harvest monitoring or else forfeit its swan hunting season.[4] *Id.* at 371. Accompanying the 2001 EA was a new Finding of No Significant Impact ("2001 FONSI") that again concluded that the proposal would not affect the environment within the meaning of NEPA and thus did not require an EIS. *Id.* at 358–63.

The second action taken by the plaintiffs occurred in August 2000, when two of the plaintiffs ("the ESA plaintiffs") petitioned the Service to list, on both an emergency and a non-emergency basis, the Tri–State Trumpeter swan population as "endangered" or "threatened" under the Endangered Species Act ("ESA"). *Id.* at 5865–5961. On September 22, 2000, the Service responded with a letter concluding that emergency listing was not warranted, and indicating that the Service "would endeavor to process a finding on [the non-emergency listing] petition as quickly as possible." *Id.* at 5962–63. On February 5, 2001, the ESA plaintiffs gave the defendants notice of their intent to sue based on the defendants' failure under ESA to issue, within 90 days of the listing petition, a finding as to whether the petition indicated that action may be warranted. *Id.* at 6043–45. On April 4, 2001, the Service replied, stating that under the ESA, the agency's finding was to be made within 90 days "to the maximum extent practicable"

---

4. As outlined in the 2001 EA, the restructured hunting season was incorporated into the September 2001 annual hunting frameworks. A.R. 576–578q.

and concluding that it was "not practicable for [the Service] to address [the] petition at this time." *Id.* at 6046. On September 6, 2001, the ESA plaintiffs notified the Service that under the ESA, it also had failed to issue its determination on the listing of the Trumpeter swan within 12 months of the initial petition. Pls.' Mot. for Summ. J. at 25. Seventeen months later, on January 28, 2003, the Service published its 90–day finding in the Federal Register. Notice of Submission of Pet. Finding at 1.

In this action, the plaintiffs charge that by failing to issue the 90–day finding and 12–month determination regarding the Trumpeter swan listing petition and failing to adequately explain the denial of the emergency listing petition, by authorizing the Trumpeter swan quota after balancing statutory and non-statutory considerations, and by omitting to prepare an environmental impact statement for the Trumpeter swan quota,[5] the defendants have violated the procedural and substantive requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.;* the ESA, 16 U.S.C. § 1531 *et seq.;* the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703 *et seq.,* and the NEPA, 42 U.S.C. § 4321 *et seq.* Compl. ¶¶ 143–52. In response, the defendants deny the plaintiffs' allegations and contend that they have met their procedural and substantive obligations under the various acts. Answer; Defs.' Mot. for Summ. J. at 1–2.

## B. Procedural History

On October 3, 2001, the plaintiffs filed their initial complaint. In December 2001, the defendants filed their answer. Approximately five weeks later, the defendants submitted the administrative record.[6] On March 10, 2002, the plaintiffs filed an amended complaint, and the defendants filed an answer thereto a few weeks later. On April 15, 2002, the plaintiffs filed both a motion for summary judgment and a motion to compel the defendants to file a complete administrative record. On May 15, 2002 the defendants filed their own motion for summary judgment. On October 10, 2002, the plaintiffs filed an additional declaration. On November 6, 2002, the defendants moved to strike the plaintiffs' declaration, or, in the alternative, to permit the defendants to supplement the record with their own declaration.

■ On February 10, 2003, this court denied the plaintiffs' motion to compel the defendants to file a complete administrative record. Mem. Op. dated Feb. 10, 2003. The court now turns to the parties' motions for summary judgment[7] and the

---

**5.** The plaintiffs characterize the defendants' action as authorizing "sport hunting" or "trophy hunting" of Trumpeter swans, while the defendants describe it as authorizing a "limited take" or "incidental take" of Trumpeter swans. *E.g.,* Pls.' Mot. for Summ. J. at 1; Defs.' Mot. for Summ. J. at 1, 6. Whatever the term used, the import is the same: a specific number of Trumpeter swans may be legally shot—intentionally or unintentionally—during the swan hunting season.

**6.** On May 15, 2002, the defendants filed a supplement to the administrative record consisting of four documents inadvertently omitted from the record and one document intended to replace an already included but illegible document. Notice of Filing of Supplements to A.R. 1.

**7.** Pursuant to Local Civil Rule 7.1(h), the plaintiffs submitted a statement of undisputed material facts. Pls.' Statement of Undisputed Facts ("Pls.' Statement"). In response, rather than the usual statement of disputed material facts, the defendants filed a short memorandum explaining that because the court may not make findings in an APA judicial review case, "there are no material facts in this case." Defs.' Combined Statement of Undisputed Facts and Resp. to Pls.' Statement of Undisputed Facts at 1. Citing to Rule

defendants' motion to strike the plaintiffs' declaration.

## III. ANALYSIS

### A. Legal Standard for Motions for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Lib-*

*erty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a

7.1(h), the plaintiffs therefore urge the court to deem their own facts admitted. Pls.' Opp'n at 4–5, 40 n. 17.

Rule 7.1(h) requires an opposition to a motion for summary judgment to be accompanied by a statement of disputed material facts. LCvR 7.1(h) (requiring a "separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated"). It provides no exception for administrative review cases. *Id.* If an opposing party fails to provide such a statement, however, the court is not required to assume that the moving party's facts are true. *Burke v. Gould,* 286 F.3d 513, 518 (D.C.Cir.2002) (noting that the district court *"may assume"* that the movant's facts are admitted) (emphasis in original).

In this case, the plaintiffs' statement of material facts raises some concerns. First, notwithstanding the rule against extra-record review, the plaintiffs' statement of material facts liberally refers to extra-record exhibits. *Am. Bioscience, Inc. v. Thompson,* 243 F.3d 579, 582 (D.C.Cir.2001); Pls.' Statement ¶¶ 1 (referring to Pls.' Ex. 6); 11 (referring to Pls.' Ex. 9); 12 (referring to Pls.' Ex. 1); 19 (referring to Pls.' Ex. 10–11); 25 (referring to Pls.' Ex. 14); 30 (referring to Pls.' Ex. 15); 34–35 (referring to Pls.' Ex. 17–18); 39 (referring to

Pls.' Ex. 19); 41 (referring to Pls.' Ex. 20); 43 (referring to Pls.' Ex. 21); 45 (referring to Pls.' Ex. 22); 50–53 (referring to Pls.'s Ex. 23–24); 56 (referring to Pls.' Ex. 25); 62 (referring to Pls.' Ex. 27); 83 (referring to Pls.' Ex. 29). In some of these citations, the plaintiffs also cites to the record; however, sifting through the citations to determine those that support the "fact" at issue places a burden on the court. Pls.' Statement ¶¶ 1, 11, 12, 19, 30, 34, 39, 43; *Burke,* 286 F.3d at 518. Second, the plaintiffs' statement contains misstatements of the record. *E.g.,* Pls.' Statement ¶¶ 11 (misquoting A.R. 2418 to support the statement that Canada, rather than the province of Alberta, lists Trumpeter swans as "threatened"); 19 (erroneously citing to A.R. 596, 4340, and 4452 to support the statement that the Tri–State Trumpeters are "a distinct population which does not interbreed with the much larger population" of RMP Trumpeters); 49 (misquoting A.R. 967 to support the statement that the draft EA acknowledged that the hunting season, rather than the translocation program, was controversial); 54 (misquoting A.R. 1043 to support statement that the hunting of Yellowstone Trumpeters could "seriously affect," rather than "be very important to," that population). The court therefore declines to deem the plaintiffs' facts admitted.

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999); *Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene,* 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

In this case, neither party has presented the court with disputed material facts. Because the pleadings "show that there is no genuine issue as to any material fact and that the [parties are] entitled to a judgment as a matter of law," summary judgment is appropriate.

## B. Legal Standard for Judicial Review of Agency Actions Pursuant to ESA, MBTA, and NEPA

■ Judicial review of agency actions under the ESA, the MBTA, and NEPA is governed by the APA. *Gerber v. Norton,* 294 F.3d 173, 178 n. 4 (D.C.Cir.2002); *Hill v. Norton,* 275 F.3d 98, 103 (D.C.Cir.2001); *Tulare County v. Bush,* 306 F.3d 1138, 1143 (D.C.Cir.2002). The APA entitles "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action ... to judicial review thereof." 5 U.S.C. § 702.

The APA requires a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706; *Tourus Records, Inc. v. Drug Enforcement Admin.,* 259 F.3d 731, 736 (D.C.Cir.2001). In making this inquiry, the reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (internal quotations omitted). At a minimum, the agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n,* 476 U.S. 610, 626, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986); *Tourus Records,* 259 F.3d at 736. An agency action normally is arbitrary or capricious if

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also County of L.A. v. Shalala,* 192 F.3d 1005, 1021 (D.C.Cir.1999) ("Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action.").

As the Supreme Court has explained, however, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Veh. Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856. Rather, the agency action under review is "entitled to a presumption of

regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

### C. The Court Grants the Plaintiffs' Motion for Summary Judgment on the ESA Claim

The plaintiffs challenge two of the defendants' actions under the ESA. First, they argue that the defendants' delay in making the 90 day initial finding and the 12 month final determination regarding the listing petition violated the ESA. Pls.' Mot. for Summ. J. at 32–34. Second, they assert that the defendants' explanation of its refusal to list the Tri–State Trumpeter swan on an emergency basis was inadequate under the APA. *Id.* at 34–35. On January 28, 2003, more than two years after the ESA plaintiffs filed their listing petition, the defendants finally issued their 90 day finding. Notice of Submission of Pet. Filing. Because the defendants' action renders the plaintiffs' first claim moot, the court addresses only the remaining claim. After reviewing the requirements of the ESA and the APA, the court concludes that the defendants' denial of the plaintiffs' emergency petition did not provide an adequate explanation and was arbitrary and capricious.

### 1. The Endangered Species Act

An interested party may petition the Service [8] to list a species as endangered or threatened. 16 U.S.C. § 1533; 5 U.S.C. § 553. To the maximum extent practicable, within 90 days of receiving the petition the Service must make an initial finding as to whether the petition presents substantial scientific and commercial information

indicating that the action may be warranted. 16 U.S.C. § 1533(b)(3)(A). Within 12 months of receiving a petition that is found to present such information, the Service must make a final determination as to whether the listing is in fact warranted. *Id.* § 1533(b)(3)(B). Although the text of the ESA does not provide for a special petition process for emergency listings, the Service's guidelines require it to review petitions requesting emergency listings, "take into consideration any evidence indicating that an emergency listing is warranted[,] and respond accordingly." *Id.* § 1533; Defs.' Mot. for Summ. J. at 43. Toward that end, the Service may issue temporary regulations for any emergency "posing a significant risk to the well-being of any species." 16 U.S.C. § 1533(b)(7).

For agency actions taken under the ESA and other statutes for which the APA provides the standard of review, "[t]he requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result." *Pub. Citizen, Inc. v. Fed. Aviation Admin.,* 988 F.2d 186, 197 (D.C.Cir.1993). This requirement is not particularly demanding, however. *Id.* Nothing more than a "brief statement" is necessary, as long as the agency explains "why it chose to do what it did." *Tourus Records,* 259 F.3d at 737. If the court can "reasonably discern[ ]" the agency's path, it will uphold the agency's decision. *Pub. Citizen,* 988 F.2d at 197 (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). Moreover, in cases involving ESA emergency listings, the D.C. Circuit has noted that "what might constitute arbi-

---

8. The ESA charges the Secretary of the Interior with making endangered and threatened species determinations. 16 U.S.C. § 1533. The Secretary has delegated primary authority to the Service. 50 C.F.R. § 402.01(b); *Defenders of Wildlife v. Norton,* 2002 WL 31940167, at *2 (Dec. 26, 2002, D.D.C.2002).

trary and capricious action or an unacceptable explanation for a regulation in the normal course of events might well pass muster." *City of Las Vegas v. Lujan,* 891 F.2d 927, 932 (D.C.Cir.1989).

## 2. The Defendants' Denial of the Plaintiffs' Emergency Petition Did Not Provide an Adequate Explanation and Was Arbitrary and Capricious

█ The plaintiffs assert that the defendants' decision to deny the ESA plaintiffs' emergency listing petition for the Tri–State Trumpeter swan population was arbitrary and capricious under the APA. Pls.' Mot. for Summ. J. at 34. They argue that the defendants' letter responding to the plaintiffs' petition is "patently insufficient" because it does not adequately explain the defendants' decision. *Id.* at 34–35. Accordingly, they ask the court to remand the defendants' denial for "some coherent explanation of whether the requested petition action is warranted under the ESA." *Id.* at 35. In response, the defendants contend that the Service "did consider the petition, assessed data presented in recent surveys, and then concluded that no compelling reason existed to implement an emergency listing of the Tri–State Trumpeter swan population." Defs.' Mot. for Summ. J. at 42–43.

The defendants responded to the emergency listing petition with a two-page letter outlining their decision. A.R. 5962–63. Paragraph three of the letter states flatly that "[t]he birds included in your petition are not recognized by the Service as a

population but are part of the Rocky Mountain Population (RMP) of Trumpeter swans." *Id.* The paragraph goes on to observe that the RMP Trumpeters have increased steadily in number for at least three decades. *Id.* Citing to annual swan survey figures, it then states that the number of RMP swans in the Tri–State region remained relatively stable at an average of 520 birds between the late 1960s and 1900. *Id.* The last few sentences of paragraph four note that the estimated number of Tri–State RMP swans declined during the period of the Service's translocation program and the discontinuance of its winter feeding program, but that estimates showed a stable trend of an average of 374 Tri–State RMP swans between 1994 and 1999. *Id.*

This explanation almost, but not quite, provides an "adequate explanation" of the defendants' result.[9] *Pub. Citizen,* 988 F.2d at 197. It does allow the court to reasonably discern most of the agency's logic in concluding, based on data regarding the number of RMP swans and the number of Tri–State swans, that emergency listing was not warranted. *Id.; Bowen,* 476 U.S. at 626, 106 S.Ct. 2101; *Tourus Records,* 259 F.3d at 737; A.R. 5962–63. But it misses the crucial first step: it provides not even a cursory explanation as to why the Service does not recognize the Tri–State swans as a population separate from the RMP swans—the heart of the plaintiffs' petition. A.R. 562–63; *cf. Tourus Records,* 259 F.3d at 737 (concluding that an agency denial letter stating simply

---

**9.** Assuming *arguendo* that the less rigorous standard described in *City of Las Vegas* applies, the defendants' explanation still is not adequate. *Compare* Defs.' Mot. for Summ. J. at 44–45 (urging the court to apply the less rigorous *City of Las Vegas* standard) *with* Pls.' Opp'n at 20–21 (countering that the *City of Las Vegas* standard applies only to actions that grant emergency listings). Whether eval-

uated under the not particularly demanding *Public Citizen* standard or the even less demanding *City of Las Vegas* standard, the agency's explanation must be a statement of reasoning, not of conclusion. *Tourus Records,* 259 F.3d at 737; *see also Int'l Bhd. of Teamsters v. United States,* 735 F.2d 1525, 1532 (D.C.Cir.1984).

that the petitioner's affidavit "[was] not adequately supported" without explaining why did not meet the APA standard).

Because the defendants did not adequately explain their denial of the emergency listing petition, the court concludes it was arbitrary and capricious. *Pub. Citizen,* 988 F.2d at 197. Therefore, the court grants the plaintiffs' motion for summary judgment on the ESA claim, and remands the letter to the Service to provide an adequate explanation by indicating its reasons for its non-recognition of Tri–State Trumpeter swans as a distinct population.[10]

### D. The Court Grants the Defendants' Motion for Summary Judgment on the MBTA Claim

The plaintiffs next charge that the defendants' authorization of the Trumpeter swan quota violates the MBTA and the APA. Specifically, they contend that the MBTA and the conventions it implements bar the defendants from balancing non-statutory factors—namely, the interests of hunters and the states—against statutory factors in authorizing the hunting of migratory birds. Pls.'s Mot. for Summ. J. at 35–39. Analyzing the MBTA, the U.S.-Canada convention, and the APA, the court determines that the defendants' authorization of the Trumpeter swan quota

was consistent with the MBTA and was not arbitrary or capricious.

### 1. The Migratory Bird Conventions and the MBTA

The United States is a party to four bilateral migratory bird conventions: the U.S.-Canada (entered into on Canada's behalf by Great Britain), U.S.-Mexico, U.S.-Japan, and U.S.-U.S.S.R (now the successor states thereto) conventions. Convention for the Protection of Migratory Birds, Aug. 16, 1916, U.S.-Gr. Brit., 39 Stat. 1702, T.S. No. 628; Convention for the Protection of Migratory Birds and Game Mammals, Feb. 7, 1936, U.S.-Mex., 50 Stat. 1311, T.S. No. 912; Convention for the Protection of Birds and Birds in Danger of Extinction and Their Environment, Mar. 4, 1972, U.S.-Japan, 25 U.S.T. 3329, T.I.A.S. No. 7990; Convention Concerning the Conservation of Migratory Birds and Their Environment, Nov. 19, 1976, U.S.U.S.S.R, 29 U.S.T. 4647, T.I.A.S. No. 9073. The conventions limit the hunting or taking of certain migratory birds. *Id.* In 1918, to implement the U.S.-Canada convention, Congress enacted the MBTA. *Humane Soc'y v. Glickman,* 217 F.3d 882, 883 (D.C.Cir.2000). Congress subsequently amended the MBTA to implement the other three conventions. 16 U.S.C. §§ 703–04.

**10.** The plaintiffs cite to the record to support their contention that the Service's view represents a "radical reversal of the agency's longstanding treatment of the Tri–State Trumpeter Swan population as a 'distinct breeding population,' " and state that the agency's view is "directly contradicted by the agency's own Administrative Record." Pls.' Opp'n at 20–21. The parts of the record to which the plaintiffs cite do not necessarily compel that conclusion, however. *E.g.,* A.R. 596 (noting only that "[t]he existing data *suggest* that these groups are distinct breeding populations") (emphasis added). Moreover, because a full administrative record must contain all information—favorable and unfavorable—that

was before the agency at the time of its decision, contradictions in "the agency's own record" on this point should not be a surprise. *See* Mem. Op. dated Feb. 10, 2003. Nevertheless, if the defendants' position does represent a change in course, their explanation must include "a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Bush–Quayle Primary Comm., Inc. v. Fed. Election Comm'n,* 104 F.3d 448, 454 (D.C.Cir. 1997) (internal citations omitted). An agency cannot "gloss[ ] over or swerve[ ] from prior precedents without discussion [or else] it may cross the line from the tolerably terse to the intolerably mute." *Id.*

Made famous by the Supreme Court's decision in *Missouri v. Holland,* the MBTA is universally recognized as a conservation statute. *Missouri v. Holland,* 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920); *Hill,* 275 F.3d at 99; *United States v. Pitrone,* 115 F.3d 1, 2 (1st Cir.1997); *United States v. Engler,* 806 F.2d 425, 431 (3d Cir.1986); *Gibbs v. Babbitt,* 214 F.3d 483, 500 (4th Cir.2000); *Hoffman Homes, Inc. v. Envtl. Prot. Agency,* 999 F.2d 256, 261 n. 3 (7th Cir.1993); *Newton County Wildlife Ass'n v. Forest Serv.,* 113 F.3d 110, 114 (8th Cir.1997); *United States v. Mackie,* 681 F.2d 1121, 1123 (9th Cir.1982); *United States v. Hardman,* 297 F.3d 1116, 1121 (10th Cir.2002). The statute extends federal protection to migratory birds covered by the four conventions. *Hill,* 275 F.3d at 99. Specifically, section 703 of the MBTA makes it unlawful to, *inter alia,* "hunt, take, capture, [or] kill" any migratory bird included in the terms of the Canadian, Mexican, Japanese, or U.S.S.R. conventions. 16 U.S.C. § 703.

Yet neither the MBTA nor the conventions prohibit the hunting of migratory birds outright. *E.g., Humane Soc'y v. Watt,* 551 F.Supp. 1310, 1319 (D.D.C.1982) (noting that the MBTA and the U.S.-Canada convention acknowledge the usefulness of hunting migratory birds). Under the MBTA, the Secretary of the Interior, "having due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times and lines of migratory flight of such birds,"

is authorized to determine when (if at all) allowing the hunting of migratory birds may be "compatible with the terms of the conventions," and to issue regulations accordingly. 16 U.S.C. § 704. Under the terms of the conventions, the parties generally may allow migratory game bird hunting as long as such hunting is barred during nesting seasons and is limited in duration. U.S.-Canada convention, arts. I, II; U.S.-Mexico convention, art. II; U.S.Japan convention, art. III; U.S.-U.S.S.R. convention, art. II. Applying these authorities, the Service has authorized the hunting of various migratory birds over the years. *E.g.,* Final Frameworks for Late Season Migratory Bird Hunting, 58 Fed.Reg. 50,188 (Sept. 24, 1993).

**2. The Defendants' Authorization of the Trumpeter Swan Quota Was Consistent With the MBTA and Was Not Arbitrary or Capricious**

Highly critical of the Trumpeter swan quota, the plaintiffs argue that the defendants have failed to explain how the 2001 EA authorization of the quota is consistent with the mandates of the MBTA [11] and the four conventions. Pls.'s Mot. for Summ. J. at 35; Pls.' Opp'n at 26. Pointing to the MBTA and the Japan and U.S.S.R. conventions, the plaintiffs assert that the defendants must restrict hunting so as to preserve, maintain, optimize and restore migratory bird populations. Pls.' Mot. for Summ. J. at 35–36. According to the

---

**11.** The plaintiffs initially refer to 16 U.S.C. § 701 as part of the MBTA. Pls.' Mot. for Summ. J. at 35. Section 701, entitled "Game and wild birds; preservation," describes certain duties and powers of the Department of the Interior and sets forth objectives regarding restoration of scarce or extinct birds. 16 U.S.C. § 701. As the plaintiffs later acknowledge, however, section 701 is not part of the MBTA. Pls.' Opp'n at 31 & n. 13. Although codified in the same title and chapter as the

MTBA, section 701 was enacted as section 1 of the Lacey Act. 16 U.S.C.A. § 701, hist. and stat. notes. Notwithstanding citations to the contrary from courts outside this circuit, this circuit defines the MBTA as sections 703–712 (subchapter II) of chapter 7 of title 16 of the U.S.Code. *E.g., Mountain States Legal Found. v. Bush,* 306 F.3d 1132, 1138 (D.C.Cir.2002). It is those sections against which the defendants' action are measured.

plaintiffs, there is nothing in the MBTA or the conventions that authorizes the defendants to consider recreational hunting, or to balance the interest of hunters and states against the defendants' statutory duties to optimize bird populations. *Id.* at 36–39. Stating that "it is clear that the decision to sport hunt imperiled Trumpeter swans does *not* further the restoration of Trumpeter swans," the plaintiffs label the defendants' quota authorization a "product of pure political compromise." *Id.* at 38–39 (emphasis in original). Therefore, reason the plaintiffs, the defendants have overstepped their bounds and violated the APA's prohibition against arbitrary and capricious action. *Id.* at 37–39.

The defendants counter that by facilitating monitoring of Trumpeter and Tundra swans, removing hunter liability for accidental harvest of Trumpeter swans, and reducing the chances that Tundra swan season would impact Trumpeter swan redistribution efforts, the authorization of a Trumpeter swan quota comports with the management and conservation goals of the MBTA. Defs.' Mot. for Summ. J. at 28–29; Defs.' Reply at 7. They assert that the MBTA and the relevant conventions expressly contemplate bird hunting, and are designed to regulate such hunting to ensure the maintenance of viable bird populations not only for the populations' sake, but for the sake of hunters. Defs.' Mot. for Summ. J. at 29, 33–34; Defs.' Reply at 8. Contending that the MBTA's directives are broadly drafted, the defendants believe

they have the discretion to consider nonstatutory factors that are relevant to the goals of the MBTA. Defs.' Mot. for Summ. J. at 30–32.

### a. The Relevant Convention

At the outset, because section 704 of the MBTA requires the Secretary to determine whether hunting is compatible "with the terms of the conventions," the court must identify the conventions against whose terms the defendants' quota authorization should be evaluated. 16 U.S.C. § 704. The plaintiffs urge the court to evaluate the defendants' action in light of all four conventions, and particularly the U.S.-Japan and U.S.-U.S.S.R. conventions.[12] Pls.' Mot. for Summ. J. at 35–36. The court is reluctant to do so, however. Although the MBTA covers all of the migratory birds listed by the treaties, *Hill,* 275 F.3d at 103, each treaty does not list all of the migratory birds covered by the MBTA. *Compare* U.S.-Canada convention, art. I *and* U.S.-Mexico convention, art. IV *with* U.S.-Japan convention, annex *and* U.S.-U.S.S.R convention, app. Only the U.S.-Canada and U.S.-Mexico conventions cover Trumpeter swans. *Id.* Accordingly, only those two conventions relate to the defendants' authorization of the Trumpeter swan quota.[13] *Alaska Fish & Wildlife Fed'n v. Dunkle,* 829 F.2d 933, 941 (9th Cir.1987) (evaluating the Secretary's hunting regulations pursuant to all four treaties given that all four of the treaties listed the migratory birds—cackling Canadian

---

12. The plaintiffs focus on two provisions: the U.S.-Japan convention requirement that hunting seasons to be set so as to "maintain [migratory bird] populations in optimum numbers," and the U.S.-U.S.S.R. convention directive that the parties set seasons to "provide for the preservation and maintenance of stocks of migratory birds." Pls.' Mot. for Summ. J. at 36; U.S.-Japan convention, art. III; U.S.-U.S.S.R convention, art. II.

13. If the court were to interpret each of the treaties to apply to all birds covered by the MBTA, and on that basis evaluate the defendants' Trumpeter swan action against the terms of all four treaties, the court in effect would be multilateralizing the U.S.' bilateral treaty obligations. The court declines the plaintiffs' invitation to unilaterally redefine this nation's international commitments.

geese, white-fronted geese, and black brants—at issue in the case).

Because the U.S.-Canada convention is more restrictive than the U.S.-Mexico convention, "all of the Secretary's regulations must be in accord with [the U.S.-Canadian] treaty." *Hill,* 275 F.3d at 103 (quoting *Alaska Fish & Wildlife Fed'n,* 829 F.2d at 941). The court therefore examines the compatibility of the defendants' authorization of the Trumpeter swan quota with the MBTA and the terms of the U.S.-Canada convention.

### b. The MBTA Factors and the Terms of the U.S.-Canada Convention

■ The defendants' authorization of the Trumpeter swan quota gave due regard to the MBTA factors and to the terms of the U.S.-Canada convention. Consistent with the MBTA's "due regard" directive, each of the three final EAs issued by the Service described the Trumpeter swans' distribution, population level (or abundance), breeding habits, migratory path (or lack thereof), and local economic impacts. A.R. 373–80, 425, 427–28, 809–14, 832–33, 2631–36, 2678–79, 2681–83. Each EA also analyzed the impact of the preferred management proposal and other management alternatives (ranging from no action to closure of Tundra swan hunting to cessation of Trumpeter swan redistribution) on the swan base and on interested parties. *Id.* at 380–90, 814–24, 2637–48; *see also id.* at 390–416, 2648–52 (responding to public comments received). The court therefore concludes that the defendants gave "due regard" to the MBTA factors. *Cf. Watt,* 551 F.Supp. at 1312, 1320–21 (finding that the Service met its statutory duty by conducting a detailed examination of the MBTA factors in establishing black duck hunting regulations).

Nor can the court conclude that the defendants' action violated the terms of the U.S.Canada convention, which directs the parties to manage migratory bird populations to, *inter alia,* ensure a variety of sustainable uses, sustain healthy populations for harvesting needs, and restore depleted populations. U.S.-Canada convention, art. II. In authorizing what it has determined to be a "biologically acceptable [and] conservative" quota of up to 15 Trumpeter swans per season, the Service concluded that "[w]hile Trumpeter swans will likely be killed during swan seasons, the surviving swans will have improved opportunity to establish traditions for using suitable and safe wintering areas and migration corridors." A.R. 381, 2648. In effect, the Service is gambling that its carrot-and-stick approach—no hunter liability during swan season, but an immediate end to the season if 15 Trumpeter swans are harvested—will result in a healthier, more viable Tri–State Trumpeter swan population. Of course this gamble will not pay off if the loss of 15 Trumpeters is not in fact biologically acceptable and conservative, the premise at the heart of this debate. *Compare* A.R. 610 (cited by the plaintiffs to show that "mortality of even a small number [of Trumpeters] will substantially impair reestablishment of this migration") *with* A.R. 408–09 (explaining Service's conclusion that harvest level will have no impact on overall population). Because determining a biologically acceptable, conservative quota requires "a high level of technical expertise," however, the court defers to the defendants' informed discretion. *Ass'n of Oil Pipe Lines v. Fed. Energy Regulatory Comm'n,* 83 F.3d 1424, 1445 (D.C.Cir.1996). Consequently, the court cannot say that the defendants' approach will not "ensure a variety of sustainable uses, sustain healthy populations for harvesting needs, and restore depleted populations." U.S.-Canada convention, art. II.

### c. The MBTA and Non Statutory Factors

The MBTA does not bar the defendants from considering non-statutory factors such as hunting interests. Nothing in the text, structure, or history of the MBTA indicates that Congress intended to prevent the agency from giving "due regard" to hunting interests. 16 U.S.C. § 703 *et seq.; Michigan v. Envtl. Prot. Agency*, 213 F.3d 663, 678 (D.C.Cir.2000) (noting that there was nothing in the text, structure, or history of a Clean Air Act provision that barred EPA from considering cost); *Grand Canyon Air Tour Coalition v. Fed. Aviation Admin.*, 154 F.3d 455, 475 (D.C.Cir.1998) (stating that there was nothing in a statute regulating air flights over Grand Canyon that forbade the government from considering the impact of its regulations on the air tour industry). After all, sections 703 and 704 direct the Service to manage rather than bar migratory bird hunting, thus indicating that Congress contemplated that some hunting would continue. 16 U.S.C. §§ 703–04; *Grand Canyon*, 154 F.3d at 475 (concluding that because the overflight statute directed the FAA to manage instead of bar air traffic, Congress must have intended that some overflights would continue).

Moreover, the record does not demonstrate that the defendants' action was "a product of pure political compromise," divorced from "science and the law" and taken in derogation of their statutory responsibilities. A.R. 364–419; *Midwater Trawlers Co-op. v. Dep't of Commerce*, 282 F.3d 710, 720 (9th Cir.2002); *Grand Canyon*, 154 F.3d at 475. To the contrary, the defendants believe that their action will improve the status of Trumpeter swans in accordance with the conservation goals of the MBTA. Defs.' Mot. for Summ. J. at 28–29. Therefore, the court determines that the MBTA does not prevent the defen-

dants from considering the impact of their action on hunters. *Grand Canyon*, 154 F.3d at 475 (stating that as long as the final rule would achieve the mandates of the overflights statute, the court did not find anything in the act that prevented the FAA from considering air tour industry interests in issuing its final rule).

In sum, because the defendants gave due regard to the MBTA factors and the terms of the U.S.-Canada convention, and did not exceed their statutory authority in considering non-statutory factors, the court concludes that the defendants' authorization of the Trumpeter swan quota was consistent with the MBTA and was not arbitrary and capricious. The court therefore grants the defendants' motion for summary judgment on the MBTA claim.

### E. The Court Grants the Defendants' Motion for Summary Judgment on the NEPA Claim

Finally, the plaintiffs contend that the defendants' authorization of the Trumpeter swan quota violates the NEPA. According to the plaintiffs, the Service should have prepared an environmental impact statement (or EIS) in light of what the plaintiffs believe were several factors that should have triggered an EIS. Pls.' Mot. for Summ. J. at 40. Pursuant to the NEPA and the APA, the court concludes that the defendants' authorization of the trumpeter swan quota without an EIS did not violate NEPA and was not arbitrary or capricious.

### 1. The National Environmental Policy Act

Under NEPA, an agency must prepare an EIS for any proposed major federal action "significantly affecting" the quality of the human environment. 42 U.S.C. § 4332(C). To determine whether an action "significantly affects" the environment, the agency must consider several factors, among them the degree to which

the effects on the quality of the human environment are likely to be highly controversial or highly uncertain, the degree to which the action may establish a precedent for future actions, the degree to which the action may cause loss of significant scientific, cultural, or historical resources, and the degree to which the action may adversely affect an endangered or threatened species. 40 C.F.R. § 1508.27(b).

If it is not clear whether an EIS is required, the agency must draw up an environmental assessment (or EA), defined as a "concise public document" that sets forth the evidence and analysis for proceeding with an EIS. *Id.* §§ 1501.4(b), 1508.9. If, based on the EA, the agency determines that an EIS is warranted, it must proceed with the EIS. *Id.* § 1501.4(d). If not, the agency must issue a Finding of No Significant Impact (or FONSI) explaining why the proposed action would not significantly affect the environment. *Id.* §§ 1501.4(e), 1508.13.

■ Because the NEPA process "involves an almost endless series of judgment calls ... [t]he line-drawing decisions ... are vested in the agencies, not the courts." *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C.Cir. 1987). Therefore, the "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *City of Olmsted Falls, Ohio v. Fed. Aviation Admin.*, 292 F.3d 261, 269 (D.C.Cir. 2002) (citing *Baltimore Gas & Elec. v. Natural Res. Def. Council*, 462 U.S. 87, 97–98, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)). In reviewing an agency's FONSI, courts in this circuit apply a four-part test that looks to see if the agency (1) accurately identified the relevant environmental concern, (2) took a "hard look" at the problem in preparing the EA, (3) is able to

make a convincing case for its FONSI, and (4) if there was an impact of true significance, convincingly established that changes in the project sufficiently reduced it to a minimum. *Grand Canyon Trust v. Fed. Aviation Admin.*, 290 F.3d 339, 341 (D.C.Cir.2002); *Humane Soc'y v. Hodel*, 840 F.2d 45, 62 (D.C.Cir.1988).

## 2. The Defendants' Authorization of the Trumpeter Swan Quota Without an EIS Did Not Violate NEPA and Was Not Arbitrary or Capricious

■ The plaintiffs contend that at the time the Service authorized the Trumpeter swan quota, it was required to take a "hard look" at the environmental consequences of its actions as well as all reasonable alternatives thereto. Pls.' Mot. for Summ. J. at 39. Moreover, they argue that the Trumpeter swan quota should have triggered an EIS because it had controversial and uncertain effects, might have caused loss of historic resources, might have established a precedent, and might have adversely affected a threatened species. Pls.' Mot. for Summ. J. at 40–45; Pls.' Opp'n at 37–44. The defendants assert that the record reflects that they took the requisite "hard look" at the potential impact of the Trumpeter swan quota, and convincingly concluded that the impact was insignificant. Defs.' Mot. for Summ. J. at 20–21. They deny that the quota had controversial or uncertain effects, or might have caused loss of historic resources, established a precedent, or adversely affected a threatened species. Defs.' Mot. for Summ. J. at 21–27; Defs.' Reply at 2–7. Instead, they assert that in issuing the 2001 EA, they reasonably concluded that an EIS was not required. Defs.' Mot. for Summ. J. at 18.

### a. The "Hard Look" Analysis

The defendants adequately considered and disclosed the impact of the Trumpeter

swan quota, and their decision not to prepare an EIS was neither arbitrary nor capricious. As noted, the agency must have (1) accurately identified the relevant environmental concern, (2) taken a "hard look" at the problem in preparing the EA, (3) been able to make a convincing case for its FONSI, and (4) if there was an impact of true significance, convincingly established that changes in the project sufficiently reduced it to a minimum. *Grand Canyon Trust,* 290 F.3d at 341.

The defendants met the first prong of the test by accurately identifying the relevant environmental concern in the 2001 FONSI. Over the past eight years, in association with the 1995, 2000, and 2001 EAs, the Service prepared three FONSIs, each in progressively greater detail. A.R. 358–63, 797–98, 2619. The 2001 FONSI at issue here is a six-page document that prefaced the agency's formal finding with a discussion of the Trumpeter swan quota background, key issues, agency decision and rationale, and public involvement. *Id.* at 358–63. It accurately identified the relevant concern as the "[i]mpacts of limited harvest on Trumpeter swans nesting in the Tri–State Region of Montana, Wyoming and Idaho." *Id.* at 359. The 2001 FONSI deemed this concern "important" and "used [it] to focus the environmental analysis and compare the impacts of the alternatives." *Id.* at 360; *accord Hodel,* 840 F.2d at 62 (finding that in authorizing hunting at a wildlife refuge, the Service identified the relevant areas of environmental concern by focusing on endangered species and the repercussions of hunting); *Ctr. for Marine Conservation v. Brown,* 1993 WL 108944, at *4 (D.D.C. Mar.29, 1993) (concluding that in authorizing a reduction of

quota, fisheries agency properly identified the relevant areas of environmental concern as the impact of the rulemaking on the tuna fishery).

With regard to the second prong of the test, the agency clearly took a "hard look" at the impact of the Trumpeter swan quota on the Tri–State Trumpeter flock.[14] All three EAs evaluate the impact of the proposed action and the alternatives on the Tri–State group, with each new EA incorporating additional modifications— fewer hunting permits, reduced quota, smaller hunt areas, and increased monitoring—to "ensure protection" of the swans. A.R. 369–73–380–90, 803–06, 814–24, 2624–28, 2637–48. The 2001 EA is 55 pages, with two appendices consisting of a 62 page proposed concept plan and 66 pages of public comment. *Id.* at 364–561. It describes in detail the purpose of the proposed action, the action and the alternatives thereto, the affected environment (including the swan base, the swan habitat, interested parties, and the local economy), and the consequences of each alternative on the affected environment. *Id.* at 365–90. In contrast to the 1995 and 2000 EAs, the 2001 EA also contains an extensive discussion of comments received from agencies and organizations. *Id.* at 390–416. Included in that discussion is the Service's response to comments specifically expressing concern about the potential impact of the proposed action on both swan distribution and population. *Id.* at 393–412. Notably, the 2001 EA incorporates new swan population survey information (including information about the Tri–State flock) and makes further modifi-

---

14. The 2001 EA notes that "[t]he Service views the RMP of Trumpeter swans as a single management entity. However, due to concerns raised by the public, potential impacts on smaller groups of Trumpeter swans

associated with specific areas, such as Yellowstone National Park and/or the Tri–State area ... will be discussed in this Environmental Assessment." A.R. 367.

cations[15] to the already modified 2000 swan hunting season. *Id.* at 374–75, 428. The 2001 EA thus demonstrates that the agency took a "hard look" at the issue. *Hodel,* 840 F.2d at 62 (concluding that the Service's 19 page EA evaluating four alternative refuge hunting plans, possible species endangerment, community and refuge benefits, disturbances to the wildlife, and the potential impact of hunting given the refuge's size satisfied the "hard look" inquiry); *Ctr. for Marine Conservation,* 1993 WL 108944, at *4 (noting that the EA as well as other portions of the administrative record clearly evidenced that the fisheries agency took a hard look at the problems of the declining tuna population).

As for the third prong of the test, the Service made a convincing case for its 2001 FONSI. In finding no significant impact, the Service relied on harvest and population data collected at the end of the 1995–1999 experimental season as well as the 2000–2001 modified season. A.R. 358. With regard to harvest data, the 2001 EA noted that during the 1995–1999 period, "a total of 32 Trumpeter swans were known to have been harvested by hunters in Montana, Utah, and Nevada," while "[f]our additional Trumpeters are known to have been shot in the Pacific Flyway in the 2000–2001 season." *Id.* at 407–08. After adjusting the numbers upward to account for noncompliance and wounding loss,[16] the Service suggested that up to 49 Trumpeter swans (or seven per year) may have been harvested in the Pacific Flyway, a harvest figure well under the annual quota.[17] *Id.* at 407, 409. As for population data, the 2001 EA cited surveys showing "exponential" growth in the RMP Trumpeter population between 1995–2001, with the overall population reaching 3,975 as of winter 2001. *Id.* at 374–75, 403–04, 428. The Service noted that the Tri–State Trumpeter component of the RMP population also had increased in number, although not at the same rate as the Canadian and restoration RMP components. *Id.* at 375, 382. In light of this harvest and population data, the 2001 EA concluded that "the six years of experience with the limited Trumpeter swan hunting option clearly demonstrates that neither the population nor any geographic component of the population is likely to be adversely impacted following implementation" of the restructured hunting season. *Id.* at 382. The Service made a convincing case. *Ctr. for Marine Conservation,* 1993 WL 108944, at *4 (conclud-

---

**15.** In addition to retaining the changes to the restructured hunting season made by the 2000 EA, the 2001 EA directs Utah to enter into a Memorandum of Understanding with the Service to (1) require swans to be physically checked within 72 hours of harvest, (2) enforce this checking requirement, (3) require hunters to have their permit in possession and validated with the time and place of each swan kill prior to its removal from field, (4) put in place provisions to effect a prompt season closure should the Trumpeter swam quota be reached, and (5) provide the Service with a weekly summary of swan harvests as well as immediate notification should the quota be reached.

**16.** According to the Service, "wounding loss" refers to swans believed wounded and lost that "[b]y definition ... are not retrieved and cannot be checked by any known means." A.R. 398. "Wounding loss is an unfortunate reality of allowing hunting and the Service and State waterfowl managers have always taken this factor into account by expanding known losses a factor for estimated wounding loss." *Id.*

**17.** "Of these, 53% or 26 were estimated to have been taken in Montana, with the remaining 23 estimated taken in Utah (22) and Nevada (1)." A.R. 407. As noted, the Service believes that most, "if not all," of the Trumpeters taken in Montana are from non-Tri-State flocks, as the Montana hunting area is north of the Tri–State area and few Trumpeters migrate northward. *Id.* at 407–08.

ing that the fisheries agency made a convincing case that the environmental impact of the quota reduction rulemaking was "insignificant").

Finally, the Service established convincingly that its modifications to the swan hunting season minimized the impact of the Trumpeter swan quota. As noted, each subsequent EA made additional modifications—fewer hunting permits, reduced quota, smaller hunt areas, and increased monitoring—to the swan hunting season to afford greater protection to the Tri-State swans. *E.g.*, A.R. 381. In light of these modifications, the defendants met the fourth factor of the four-part test. *Hodel*, 840 F.2d at 62 (finding the Service's presentation in support of a hunting plan of limited scope to be sufficiently convincing).

### b. The "Significantly Affects" Factors

The defendants' conclusion that the Trumpeter swan quota did not have highly controversial or uncertain effects, and was not likely to cause loss of historic resources, establish a precedent, or adversely affect a threatened species was not arbitrary or capricious. As noted, in determining whether an action "significantly affects" the environment and thus triggers an EIS, the agency must consider the degree to which, *inter alia*, the effects on the quality of the human environment are likely to be highly controversial or highly uncertain, the action may establish a precedent for future actions, the action may cause loss of significant scientific, cultural, or historical resources, and the action may adversely affect an endangered or threatened species. 40 C.F.R. § 1508.27(b).

First, for an action to qualify as "highly controversial" within the meaning of NEPA, there must be "a substantial dispute [about] the size, nature, or effect of the major federal action rather than the existence of opposition to a use." 40 C.F.R. § 1508.27(b)(4); *Friends of the Earth v. Army Corps of Eng'rs*, 109 F.Supp.2d 30, 43 (D.D.C.2000); *see also Rucker v. Willis*, 484 F.2d 158, 162 (4th Cir.1973). Controversy in the context of NEPA does not exist merely because some are highly agitated about, vigorously oppose, or have raised questions about the action.[18] *Fund for Animals v. Frizzell*, 530 F.2d 982, 988 n. 15 (D.C.Cir.1975); *Coalition On Sensible Transp. Inc. v. Dole*, 642 F.Supp. 573, 588 (D.D.C.1986); *Peshlakai v. Duncan*, 476 F.Supp. 1247, 1255 n. 23 (D.D.C.1979). Nor does NEPA controversy exist simply because there are conflicting views among experts. *Sierra Club v. Watkins*, 808 F.Supp. 852, 862 (D.D.C.1991).

In this case, it is "plainly apparent from the record" that there is disagreement over the effects of the proposed Trumpeter swan quota. Pls.' Mot. for Summ. J. at 41. In fact, in the 2001 EA, the Service "readily acknowledge[d] that biologists' opinions differ on the role of the proposed swan hunting seasons on the status and distribution of RMP Trumpeter swans." A.R. 411; *see also* A.R. 2625 (noting as part of the 2000 EA that "[t]here was a wide disparity of opinion offered on the actual impact of this limited harvest on [RMP] redistribution"), 2618 (noting that "the major controversy seems to be determination of the appropriate harvest alternative for

---

18. "That kind of bootstrap reasoning would permit such an opponent to sidestep his burdens under the law simply by declaring the existence of a controversy." *Peshlakai v. Duncan*, 476 F.Supp. 1247, 1255 n. 23 (D.D.C.1979); *see also State of N.C. v. Fed. Aviation Admin.*, 957 F.2d 1125, 1134 (4th Cir.1992) (noting that if controversy were equated with opposition, the EIS outcome would be governed by a "heckler's veto").

Utah").[19]

But the record also shows that under this circuit's precedent, this disagreement does not qualify as a NEPA controversy. No other federal agency objected to the 2001 EA or requested that an EIS be prepared. *Coalition On Sensible Transp. Inc. v. Dole*, 642 F.Supp. 573, 587 (D.D.C. 1986) (deeming significant that no agency charged with environmental responsibility opposed a proposed highway project); *see Friends of the Earth*, 109 F.Supp.2d at 43 (requiring an EIS for certain casino permits in part because three other federal agencies had "pleaded with the Corps to prepare an EIS"). Although the Bureau of Reclamation and Yellowstone National Park had expressed strong concerns about the 2000 EA, the modifications made to the 2001 EA apparently helped ameliorate their concerns. *Compare* A.R. 1043–44, 1108–09 (criticizing the 2000 EA as deficient in evaluating the impact of the restructured hunting season on the Tri–State Trumpeter flock) *with* A.R. 496–97 (noting the 2001 EA conclusion of insignificant impact and stating that "[w]e look forward to working with you to monitor and mitigate" the impact on the Yellowstone population) *and* 526h 526i (stating that the 15 swan quota was reasonable and the area and season restrictions were improvements, and urging increased monitoring).

Nor does disagreement between the Service's experts and outside experts create a NEPA controversy, for "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Sierra Club*, 808 F.Supp. at 862; *see also Fund for Animals v. Babbitt*, 903 F.Supp. 96, 115 (D.D.C.1995) (noting that "disagreement [among experts] does not render the agency's action arbitrary and capricious"). Finally, the fact that the quota is the subject of disagreement between the plaintiffs and those with hunting interests does not indicate a NEPA controversy. *Ctr. for Marine Conservation*, 1993 WL 108944, at *5 (concluding that although a tuna quota reduction would cause some controversy between the fishing industry and conservation groups, its effects were not "highly controversial" under NEPA). Therefore, the defendants' conclusion that the quota was not "highly controversial" was not arbitrary or capricious. 40 C.F.R. § 1508.27(b)(4).

Second, the defendants were not acting arbitrarily or capriciously in concluding that the Trumpeter swan quota did not have highly uncertain effects, would not cause the loss of historic resources, and would not adversely affect a threatened species. 40 C.F.R. § 1508.27(b)(5)-(6), (8)-(9). The updated Tri–State flock survey information that the Service considered in issuing the 2001 EA significantly lessened any uncertainty as to the impact of the Trumpeter swan quota on the Tri–State population (whether or not considered "historic"[20]). *Id.* § 1508.27(b)(5), (8); *cf.*

---

**19.** The plaintiffs cite other examples from the record that they believe demonstrate the controversial nature of the authorization of the Trumpeter swan quota. Pls.' Mot. for Summ. J. at 41–42; Pls.' Opp'n at 39–40. Many of the cited references address not the Trumpeter quota, but other issues, however. *E.g.*, A.R. 967 ("[t]he *translocation program* was among the most controversial aspects of Trumpeter swan management during recent years") (emphasis added).

**20.** The plaintiffs cite to *Friends of the Earth* to support the argument that the Tri–State Trumpeter flock qualifies as a "historical resource" under 40 C.F.R. § 1508.27(b)(8). Pls.' Mot. for Summ. J. at 44. Because the *Friends of the Earth* court was commenting on "ecologically critical areas" factor of 40 C.F.R. § 1508.27(b)(3), it does not support plaintiffs' argument. *Friends of the Earth*, 109 F.Supp.2d at 43.

*Anderson v. Evans*, 314 F.3d 1006, 1019 (9th Cir.2002) (finding uncertainty when "no one, including the government's retained scientists, has a firm idea what will happen to the local whale population if the Tribe is allowed to hunt and kill whales"). As for the possibility of adversely affecting a threatened or endangered species, at the time the Service issued the 2001 EA (and as is the case today), the Trumpeter swan did not qualify as either threatened or endangered.[21] 40 C.F.R. § 1508.27(b)(9); A.R. 367–68, 2548.

Finally, there is no indication in the record that the authorization of the Trumpeter swan quota would establish a precedent that would form "a link in a chain of bureaucratic commitment that will become progressively harder to undo the longer it continues." *Sierra Club v. Marsh*, 769 F.2d 868, 879 (1st Cir.1985); 40 C.F.R. § 1508.27(b)(6). Since the Service first authorized the quota in 1995, it has made a number of modifications regarding the permit, quota, area, and monitoring requirements that indicate a willingness on the agency's part to revisit the original authorization. *E.g.*, A.R. 369–73–380–90, 803–06, 814–24, 2624–28, 2637–48. Moreover, in the 2001 EA the Service indicated that the Montana and Nevada seasons will be reviewed regularly:

> The Service plans to review results with respect to both Tundra swan and Trumpeter swan harvests annually and proposed changes would be considered as a normal part of the annual hunting regulations process. The Service views the

seasons in Montana and Nevada as operational seasons that are subject to the normal annual review of status and harvest of the affected populations. Adjustments to these seasons will be made, if needed, as part of the normal annual regulatory process for hunting migratory birds.

*Id.* at 368. As for the Utah season, the Service noted that

> [a]s proposed here, the season in Utah is experimental and will thus be fully reviewed at the conclusion of the 2002–2003 hunting season when a determination as to the acceptability of continuing the hunt will be made. At the conclusion of the experimental period, an assessment report will be prepared and the Service will determine the appropriate course of action for either continuation or suspension of this experimental season.

*Id.* The authorization of the Trumpeter swan quota therefore is not "thoughtless[ly] setting in motion" an action that cannot be undone. *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1162 (9th Cir.1998). The Service will "have an opportunity to consider the environmental effects of the [quota] at a later time," and that later consideration should "offer the decisionmaker a meaningful choice about whether to proceed."[22] *Sierra Club*, 769 F.2d at 879.

In sum, because the defendants adequately considered and disclosed the environmental impact of the Trumpeter swan

---

21. The plaintiffs point out that the Service classifies the Trumpeter swan as a "Bird of Management Concern" (defined as a species that may become a candidate for threatened or endangered species listing) and contend that Canada considers Trumpeter swans endangered. Pls.' Mot. for Summ. J. at 45. Whether or not the plaintiffs' arguments are accurate, neither pre-listing status nor foreign

regulation of a species is a "significance" factor under NEPA regulations. 40 C.F.R. § 1508.27(b).

22. Given the unique circumstances and attributes of the Tri State Trumpeter flock, moreover, the authorization of the Trumpeter swan quota here should not hold precedential value for management of other migratory birds.

quota, and because the quota did not have highly controversial or uncertain effects and was not likely to cause loss of historic resources, establish a precedent, or adversely affect a threatened species, the court concludes that the defendants' authorization of the Trumpeter swan quota without preparing an EIS did not violate NEPA and was not arbitrary and capricious. Therefore, the court grants the defendants' motion for summary judgment on the NEPA claim.

### F. The Court Grants the Defendants' Motion to Strike the Plaintiffs' Declaration

■ After the filing of dispositive motions, the plaintiffs submitted an additional declaration. Pls.' Notice of Filing Additional Decl. Under the general rule against extra-record review, the court may not consider materials—including declarations—that are outside the administrative record. *Ctr. for Auto Safety v. Fed. Highway Admin.,* 956 F.2d 309, 314 (D.C.Cir. 1992); *e.g., Southwest Ctr. for Biological Diversity v. Norton,* 2002 WL 1733618, at *7 (D.D.C. July 29, 2002). Relying on an exception once suggested by the D.C. Circuit, the plaintiffs submit that the court may consider their extra-record declaration "for the sole purpose of assisting the Court in fashioning appropriate equitable remedies if plaintiffs prevail on the merits." Pls.' Mem. in Opp'n to Defs.' Mot. to Strike Decl. at 1–2; *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989). In light of the court's conclusions today, the court grants the defendants' motion to strike the plaintiffs' declaration.

### IV. CONCLUSION

For all these reasons, the court grants in part and denies in part the plaintiffs' motion for summary judgment. The court also grants in part and denies in part the defendants' motion for summary judgment.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 25th day of February, 2003.